UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Thomas Eisenrich,

      Plaintiff,

            Civ. No. 07-1845 (RHK/JSM)
            **MEMORANDUM OPINION AND ORDER**

v.

Minneapolis Retail Meat Cutters and Food
Handlers Pension Plan,

      Defendant.

Robert J. Hajek, Donald L. Beauclaire, Hajek, Meyer & Beauclaire, PLLC, Minneapolis, Minnesota, for Plaintiff.

Carl S. Wosmek, David S. Anderson, Amy L. Court, McGrann Shea Anderson Carnival Straughn & Lamb, Chartered, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Thomas Eisenrich has sued his former pension plan, the Minneapolis Retail Meat Cutters & Food Handlers Pension Plan (the "Plan"), alleging that the Plan improperly suspended his pension payments. Eisenrich appealed the suspension to the Plan's Board of Trustees (the "Board"), but his appeal was denied; he then commenced the instant action. Presently pending before the Court is the Plan's Motion for Summary Judgment on Counts 2 and 3 of Eisenrich's Complaint.[1] For the

---

[1] The Court previously dismissed Count 1 of the Complaint, which sought an order compelling arbitration of the instant dispute.

reasons set forth below, the Court will deny the Motion and *sua sponte* grant summary judgment for Eisenrich.

## BACKGROUND

The relevant facts in this case are not in dispute and, accordingly, are recited without citation to the record. Eisenrich was employed as a meat cutter for thirty years by several Twin-Cities-area food retailers. During his employment, he was a member of Local 653 of the United Food and Commercial Workers Union (the "Union"). The Plan was created by the Union to provide pension benefits to its members. Upon his retirement in June 2001, Eisenrich began receiving monthly pension payments from the Plan.

Under the terms of the Plan, any retired Plan participant who engages in 64 hours (or more) of "disqualifying employment" in a given month will have his or her benefits suspended for that month.[2] "Disqualifying employment" is defined in the Plan as "employment or self-employment that is: (a) in an industry . . . covered by the Plan when the Participant's pension payments began . . ., and (b) in the geographic area covered by the Plan when the Participant's pension payments began . . ., and (c) in a trade or craft in which the Participant worked under the Plan at any time." This language tracks a provision in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, that grants pension plans the right to suspend payments of accrued

---

[2] Different rules apply to participants who began receiving pension payments after October 1, 2003, but those rules are not at issue here.

pension benefits when a participant is employed "in the same industry, in the same trade or craft, and [in] the same geographic area covered by the plan." 29 U.S.C. § 1053(a)(3)(B)(ii).

On June 10, 2001, shortly after he began receiving pension payments, Eisenrich accepted a position as an "Executive Team Meat Leader" with Target Corporation, working at the Chaska, Minnesota, Super Target store. In that position, Eisenrich was responsible for supervising the store's meat department; the position also required him to cut meat on some occasions. When the Plan learned of Eisenrich's employment in February 2002, it suspended his pension payments, asserting that his job amounted to "disqualifying employment."

Eisenrich appealed the suspension of his pension payments in accordance with the procedures set forth in the Plan, which (at the time) included binding arbitration. He acknowledged that his position was in the same industry as his prior work as a meat cutter and in the same geographic area, but he asserted that his new, "supervisory" position was not within the same "trade or craft" as his prior work. In support of that argument, he relied on a regulation promulgated by the Department of Labor indicating that the term "trade or craft," as used in ERISA's suspension-of-benefit rules, means "a skill or skills, learned during a significant period of training or practice, which is applicable in occupations in some industry." 29 C.F.R. § 2530.203-3(c)(2)(ii). According to Eisenrich, his new position did not require him to make substantial use of any skills he

had acquired during his 30 years as a meat cutter and, accordingly, could not be considered in the same "trade or craft" as his prior employment.

Before an arbitrator could rule on Eisenrich's appeal, however, he voluntarily resigned his position with Target. He notified the Plan of his resignation by two letters dated April 27, 2004. His counsel also sent the Plan a letter stating that "[i]n June [2004] [Eisenrich] is forming his own business, which is a delivery route for Pepperidge Farms baked products." Based on Eisenrich's resignation from his position with Target, the Plan resumed making pension payments to him on June 1, 2004.

Despite his resignation from Target, Eisenrich's arbitration claim remained pending, and a hearing was held before an arbitrator on October 19, 2004.[3] On December 20, 2004, the arbitrator upheld the Plan's suspension of Eisenrich's pension benefits. The arbitrator rejected as "myopic" Eisenrich's contention that he engaged in very little meat cutting in his Target position and, accordingly, that his new job was not within the same "trade or craft" as his prior meat-cutting work:

> The Federal Regulations, as espoused by the Trustees, make it clear that the scope of the law is focused upon the involved *industry*, not the narrower concept of *trade* or *craft*. Mr. Zweig [the President of the Union] rendered a very comprehensive explanation of the historical evolution of the meat cutter trade in the greater Minneapolis area. The shift to wholesalers performing the bulk of the actual meat cutting has meant that meat cutters at the retail level have had to perform the stocking, ordering, product rotating, sanitary measures

---

[3] Eisenrich's appeal was not rendered moot by his resignation. Rather, it merely limited the damages he could recover if successful on his claim: the total of the payments that allegedly should have been made between the date the Plan suspended his pension benefits and the date it resumed them.

>and supervisory functions in order to maintain bargaining unit positions in this classification.

(emphases in original). Because Eisenrich performed many of these functions in his new position with Target, the arbitrator ruled that the job amounted to "disqualifying employment" under the Plan.

Meanwhile, in 2005 the Plan began requiring participants receiving pension payments, like Eisenrich, to fill out an annual questionnaire concerning the work they performed, so that the Plan could determine whether such participants were engaged in "disqualifying employment." Eisenrich filled out the questionnaire and stated that he was employed 160 hours per month as the "owner-operator" of Farm Snacks, Inc., a company he had formed for his Pepperidge Farm distributorship. He described his job duties as "delivering + merchandi[s]ing Pepperidge Farm products."

The Plan believed that Eisenrich's job might constitute "disqualifying employment," depending upon where, and to whom, he was delivering Pepperidge Farm products. Accordingly, it hired a private investigator to observe and document Eisenrich's work activities. From October 24, 2005, to November 30, 2005, the investigator followed Eisenrich nearly every day; he observed Eisenrich picking up Pepperidge Farm products and delivering them to grocery stores and other stores within the geographic jurisdiction of the Plan. The Plan then accessed the Pepperidge Farm website and learned that the position held by Eisenrich is called "Sales Development Associate" ("SDA") – the duties of that position include delivering and merchandising

Pepperidge Farm baked goods to grocery stores and other stores, and rotating, stocking, shelving, and ordering baked goods.

Based on these facts, the Plan concluded that Eisenrich was again engaged in "disqualifying employment" and suspended his pension payments. Eisenrich appealed the suspension to the Board, arguing (as with his previous appeal) that his Pepperidge Farm work was not in the same "trade or craft" as his prior meat-cutting work.[4] The Board disagreed, concluding that "[t]he duties of Pepperidge Farm SDAs are similar to, and in several instances, overlap with collectively bargained work performed by other Plan Participants." (Board of Trustees Decision ("Decision") at 5.) The Board continued:

> In . . . interpreting the phrase "trade or craft," the Department [of Labor] explains that . . . "the determination whether a particular job classification, job description or industrial occupation constitutes or is included in a trade or craft shall be based upon the facts and circumstances of each case." Hence, a particular occupation may either individually "constitute," or may be included in, a trade or craft.
>     As the record details in Eisenrich's previous suspension appeal, he learned skills in his various meat cutting positions that extended beyond physically cutting meat. The job category of "meat cutter," as negotiated in the collective bargaining agreement, focuses on merchandising and supervising as well. Under this classification, skills such as food safety, product rotation, guest service, ordering, supervising, and other merchandising skills are all included within the trade or craft of meat cutting.
>     Clearly, both Eisenrich's past employment as a meat cutter/meat cutting supervisor and his present employment as a Pepperidge Farm SDA encompassed the skill of merchandising. He admitted as much in his annual employment affidavit. . . . According to the relevant DOL regulations, if a

---

[4] By this time, the Plan's terms had been amended to remove arbitration as a step in the appeal process.

-6-

> participant's reemployment position includes merely one skill learned in his/her covered occupation, the new position may constitute disqualifying employment. See 29 C.F.R. § 2530.203[-3](c)(2)(ii) (defining a "trade or craft" as "(a) a *skill* or skills" applicable in some occupations in an industry) (emphasis added).
>
> Eisenrich's employment with Pepperidge Farm appears to encompass other skills he learned as a meat cutter or meat cutting supervisor as well. For instance, in order to fill purchase orders for his various Pepperidge Farm retail customers, Eisenrich invariably relies on skills such as product rotation, inventory, and ordering. The private investigation record confirms this supposition. Eisenrich was observed on numerous occasions at a supply center, loading and unloading plastic bags full of items into his trailer. According to the investigation record, he would then travel to various Twin Cities area retail grocery stores and carry plastic bags full of items into those stores' stocking areas. These actions suggest Eisenrich does more than merely drive a set distribution route and deliver Pepperidge Farm products to the stores. Rather, he appears to be actively engaged in inventory control, ordering, and product rotation.

(Id. at 6-7.) As a result, the Board concluded that Eisenrich was engaged in "disqualifying employment" and upheld the suspension of his pension payments.

Eisenrich then commenced the instant action, alleging *inter alia* that the suspension of his pension payments violated ERISA (Count 2) and that the Plan should be equitably estopped from refusing to make pension payments based on his work as a Pepperidge Farm SDA (Count 3). The Plan now seeks summary judgment on these claims.

**STANDARD OF REVIEW**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

Parroting the argument he raised on appeal to the Board, Eisenrich argues that the Plan improperly suspended his pension payments because his Pepperidge Farm work cannot be considered to be in the same "trade or craft" as his prior work as a meat cutter.  Eisenrich also argues, in the alternative, that the Plan is equitably estopped from denying him pension benefits.  Because the Court concludes that Eisenrich is not employed in the same "trade or craft" as his prior work as a meat cutter and, accordingly, the Plan's

suspension of his pension payments was improper, it need not reach his alternative equitable-estoppel argument.[5]

## I.     Review of decisions by ERISA plan administrators

Where an ERISA plan delegates discretionary authority to an administrator to determine a participant's eligibility for benefits, the administrator's decision to deny benefits typically is reviewed under an abuse-of-discretion standard.  E.g., Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114-15 (1989); Pralutsky v. Metro. Life Ins. Co.,

---

[5] Although the Court does not reach the equitable-estoppel argument, it believes that there is merit to that argument.  There can be little doubt that the Plan was fully aware of Eisenrich's Pepperidge Farm work when it resumed making pension payments in June 2004; indeed, Eisenrich informed the Plan by letter in April 2004 that he was "forming his own business, which is a delivery route for Pepperidge Farms baked products."  Eisenrich asserts that he reasonably viewed the resumption of such payments and the continuation thereof for 18 months as evidence that the Plan believed his Pepperidge Farm work was not "disqualifying employment."  The Plan counters that its resumption of pension payments cannot be viewed as a tacit admission that Eisenrich's work was not disqualifying because his April 2004 letter did not state whether he intended to work (1) in the same geographic area as the Plan and (2) more than 64 hours per month, two prerequisites to a finding of disqualifying employment.  The Plan's argument is not persuasive, because its resumption of payments and the continuation thereof for 18 months occurred shortly after the Plan had litigated the propriety of suspending Eisenrich's pension payments due to his work at Target.  The resumption of payments, therefore, occurred under auspices that would leave a reasonable person with the impression that the Plan had carefully scrutinized Eisenrich's new employment and found the resumption of payments appropriate.  Moreover, the Plan waited more than 16 months after it resumed the payments before taking steps to determine whether Eisenrich's new work was precluded under the Plan; each passing month further cemented Eisenrich's view that the Plan took no issue with his work as an SDA.  In the Court's view, under these facts it was reasonable for Eisenrich to assume that the Plan had determined that his Pepperidge Farm work was not disqualifying employment.  Moreover, Eisenrich relied on the resumption of his pension payments to his detriment; he was required to obtain a loan to pay for the Pepperidge Farm distributorship, and the amount and timing of the payments on that loan were tied to his monthly pension payments.

435 F.3d 833, 837 (8th Cir. 2006).[6]  There is no dispute in this case that the Plan grants discretionary authority to the Board to determine eligibility for benefits and to construe the terms of the Plan.  Accordingly, both parties agree that the Board's decision upholding the suspension of Eisenrich's pension payments must be reviewed under the abuse-of-discretion standard.  (See Def. Mem. at 17; Mem. in Opp'n at 8-9.)

Abuse-of-discretion review is "highly deferential" and "reflects the fact that courts are hesitant to interfere with the administration of a pension plan."  Maune v. IBEW, Local No. 1, Health & Welfare Fund, 83 F.3d 959, 962-63 (8th Cir. 1996) (citation omitted).  Under this standard, an administrator's decision must only be reasonable, that is, it need only be "supported by substantial evidence."  Alexander v. Trane Co., 453 F.3d 1027, 1031 (8th Cir. 2006).  Stated differently, the question is whether a "reasonable person *could* have reached a similar decision, given the evidence before him, [and] not [whether] a reasonable person *would* have reached that decision."  Groves v. Metro. Life Ins. Co., 438 F.3d 872, 875 (8th Cir. 2006) (emphases in original).

Yet, abuse-of-discretion review is not a toothless tiger – as this Court has noted, while such review is deferential, it is not the same as no review at all.  Lao v. Hartford Life & Accident Ins. Co., 319 F. Supp. 2d 955, 959 (D. Minn. 2003) (Kyle, J.) (quoting Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996)).  Indeed, abuse-of-discretion

---

[6] This standard does not apply where there exists "a serious procedural irregularity" that causes a "serious breach" of the plan administrator's fiduciary duty to the claimant. Pralutsky, 435 F.3d at 837.  No such procedural irregularity is alleged here.

review must not devolve into a judicial "rubber stamp" of an administrator's decision. Torres v. UNUM Life Ins. Co. of Am., 405 F.3d 670, 680 (8th Cir. 2005); accord Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 552 (6th Cir. 2008) (noting that such review is more than a "mere formality"). A court examining whether an administrator abused its discretion, therefore, must carefully scrutinize the administrator's decision and determine whether it was "extremely unreasonable, extraordinarily imprudent, or arbitrary and capricious." Meyers v. Hartford Life & Accident Ins. Co., 489 F.3d 348, 351 (8th Cir. 2007). In making that determination, the court must consider the five factors set forth in Finley v. Special Agents Mutual Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992): (1) whether the administrator's interpretation of the plan's terms is consistent with the goals of the plan, (2) whether the interpretation renders any of the plan meaningless or inconsistent, (3) whether the interpretation conflicts with the requirements of ERISA, (4) whether the plan has interpreted the words at issue consistently, and (5) whether the interpretation is contrary to the clear language of the plan. While these factors serve as useful guideposts, in some cases "simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." Lao, 319 F. Supp. 2d at 959 (quoting Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001)); accord Gallo, 102 F.3d at 922.

## II.     Application of the abuse-of-discretion standard here

As the foregoing makes clear, the question the Court must answer is whether the Board abused its discretion when it determined that Eisenrich's Pepperidge Farm work is within the same "trade or craft" as his prior work as a meat cutter. In reaching its decision, the Board noted that, under ERISA, the term "trade or craft" focuses on the skills utilized and learned in a specific job. (Decision at 7.)[7] It then found that Eisenrich had learned "skills such as . . . product rotation, . . . ordering, . . . and other merchandising skills" while employed as a meat cutter, and that he used the skills of "merchandising, product rotation, inventory, and ordering" as a Pepperidge Farm SDA. (Id.) Accordingly, it concluded that Eisenrich was using skills in his SDA job that he learned while he was a meat cutter and, as a result, the jobs were in the same "trade or craft." (Id.) In the Court's view, the Board's conclusion resulted from a strained interpretation of the term "trade or craft" and amounted to an abuse of discretion.

First, the regulations promulgated pursuant to ERISA indicate that a "trade or craft" is a "skill or skills, *learned during a significant period of training or practice*, which is applicable in occupations in some industry." 29 C.F.R. § 2530.203-3(c)(2)(ii) (emphasis added). There is no evidence before the Court, nor does there appear to have been any evidence before the Board, that skills like "ordering," "inventory," and "product

---

[7] Although the language of the Plan controls, both parties agree that the meaning of the term "trade or craft" in the Plan is consistent with the definition of that term in 29 C.F.R. § 2530.203-3(c)(2)(ii). (See Def. Mem. at 12; Mem. in Opp'n at 11-12.)

rotation" were learned by Eisenrich during a "significant period of training or practice" in his position as a meat cutter.[8] The Court agrees with Eisenrich that "looking at an expiration date on a box and removing product that has expired [does not] amount[] to a skill learned during a significant period of training." (Mem. in Opp'n at 12; accord id. at 14 ("The plan's argument that tasks such as product rotation, stocking shelves, etc., are skills that he 'learned' while in covered employment is . . . unavailing. These 'skills' as they are called by the Plan, were not learned while in covered employment – most people learn them at a young age, when a parent tells a child not to drink milk that is past its expiration date.").)

Second, the Board found that the term "trade or craft . . . includes *generally applicable skills* learned in an occupation," citing merchandising as one such "generally applicable skill." (Decision at 7 (emphasis added).) By this line of reasoning, however, Eisenrich would be precluded from working in almost any job in the retail food industry

---

[8] In fact, the Board appears to have relied on the description of the "meat cutter" position in the Union's collective-bargaining agreement, rather than on the skills Eisenrich actually learned in his position. (See Decision at 7 ("The job category of 'meat cutter,' *as negotiated in the collective bargaining agreement*, focuses on merchandising and supervising . . . . *Under this classification*, skills such as food safety, product rotation, guest service, ordering, supervising, and other merchandising skills are all included within the trade or craft of meat cutting.") (emphases added); see also id. at 5 ("[t]he duties of Pepperidge Farm SDAs are similar to, and in several instances, overlap with collectively bargained work *performed by other Plan Participants*") (emphasis added).) The Plan confirmed as much at oral argument, asserting that it was appropriate for the Board to focus on duties typically performed by meat cutters rather than on the job functions actually performed by Eisenrich; were extensive fact finding concerning a participant's job functions required, it purportedly would be "impossible" to appropriately administer the Plan. This argument, however, is belied by 29 C.F.R. § 2530.203-3(c)(2)(ii), which *requires* an examination of "the facts and circumstances of each case" in determining whether two jobs fall within the same "trade or craft."

in the Twin Cities. Indeed, the entire purpose of food retailing is to sell food, and merchandising is an integral part of doing so. Hence, it is difficult for the Court to conceive of an occupation connected with the retail sale of food – whether as a cashier at a grocery store or as the driver of a delivery truck – that could be said not to include some component of "merchandising."[9] Yet, the Plan clearly contemplated that Eisenrich could work in the food industry without losing his pension benefits – a participant engages in "disqualifying employment" under the Plan *only* if (1) his work is in the food industry *and* (2) his work is in the same "trade or craft" as his prior employment.

Further evidence of the overbreadth of the Board's interpretation of the term "trade or craft" is found in its reliance on the arbitration award in Eisenrich's previous appeal. There, the arbitrator expressly stated that "[t]he Federal Regulations, as espoused by the Trustees, make it clear that the scope of the law is focused upon the involved *industry*, not the narrower concept of *trade* or *craft*." That conclusion – with which the Board agreed (see Decision at 8-9, 13 (emphases in original)) – is at odds with ERISA, which expressly distinguishes between an "industry" and a "trade or craft" *within* an industry. See 29 U.S.C. § 1053(a)(3)(B)(ii) (authorizing pension plans to suspend pension payments when a participant is employed "in the same industry, in the same trade or craft, and the same geographic area covered by the plan"); Thompson v. Asbestos Workers Local No. 53

---

[9] As the Board itself recognized, merchandising is "within the scope of work of [all] retail grocery employees. Regular store personnel perform [merchandising] duties on virtually all of the products sold in the stores." (Decision at 7.)

-14-

Pension Fund, 716 F.2d 340, 343 (5th Cir. 1983) ("The trade or craft classification is obviously oriented at someone who moves into *some other kind of employment within the industry*.") (emphasis added).

In the Court's view, the only reasonable interpretation of the term "trade or craft" consistent with both the Plan and ERISA (as well as the regulations promulgated thereunder) must be something narrower than all of the "generally applicable skills" one might learn in a particular occupation. Under such a broad reading of the term, a person who developed the "skill" of juggling multiple telephone calls could be precluded from taking any subsequent job in which he or she would have to answer a telephone, a plainly absurd result. Simply put, allowing the term "trade or craft" to sweep within its ambit an overly broad range of "skills" would, in most circumstances, preclude an employee from accepting any job in the same industry. Such an interpretation would be inconsistent with both ERISA and the express language of the Plan: it would render the term "trade or craft" duplicative of the term "industry" in the "disqualifying employment" section of the Plan and in 29 U.S.C. § 1053(a)(3)(B)(ii). The Court will not subscribe to an interpretation that would render nugatory the term "trade or craft." Rather, it believes that the only reasonable basis upon which to conclude that two jobs are within the same "trade or craft" is that they involve a *material* overlap of job responsibilities. See Smith v. CMTA-IAM Pension Trust, 654 F.2d 650, 659 n.12 (9th Cir. 1981) (suggesting that two

jobs are in the same "trade or craft" when they involve "significantly the same" skills, not just some overlap in job functions). That is simply not the case here.[10]

At bottom, "simple common sense . . . require[s] the court to pronounce [the] administrator's determination arbitrary and capricious" in this case. Lao, 319 F. Supp. 2d at 959.[11] Stated differently, "[t]his case brings to mind [an] old adage: 'if it walks like a duck, quacks like a duck and looks like a duck, it has got to be a duck.' However, merely calling something a duck does not make it a duck." In re Constitutional Trust No. 2-562, 114 B.R. 627, 633 n.14 (Bankr. D. Minn. 1990) (citations omitted); see also Mavity v. Fraas, 456 F. Supp. 2d 29, 31 n.1 (D.D.C. 2006) ("at the end of the day, even if you put a calico dress on it and call it Florence, a pig is still a pig"). Eisenrich previously worked as a meat cutter; he now delivers Pepperidge Farm crackers, cookies, and baked goods to grocery stores. Common sense dictates that this job is not in the same "trade or craft" as Eisenrich's prior work as a meat cutter because he does not primarily utilize skills learned over a substantial period of time as a meat cutter, notwithstanding that work as an SDA might involve some "merchandising" of Pepperidge Farm products. Accordingly, the

---

[10] At oral argument, the Plan asserted that in order to determine whether two jobs are within the same trade or craft, the Court should determine whether those jobs are "competitive." The Court disagrees that two jobs are within the same "trade or craft" whenever they might be labeled as "competitive." In any event, the Court believes that Eisenrich's Pepperidge Farm work is not "competitive" with his work as a meat cutter, for the reasons discussed above.

[11] This is not to say that the Court has ignored Finley. Indeed, the foregoing analysis makes clear that several Finley factors have been satisfied here – for example, the Board's interpretation of the term "trade or craft" effectively renders that term meaningless and conflicts with ERISA (and the regulations promulgated thereunder).

Court determines that it was unreasonable for the Board to conclude that Eisenrich is engaged in "disqualifying employment" and, as a result, the suspension of his pension payments was an abuse of discretion. Hence, the Court will deny the Plan's Motion *vis-a-vis* Count 2.

Moreover, because there exists no genuine issue of material fact, the Court will grant summary judgment to Eisenrich *sua sponte* on that claim. Although Eisenrich has not cross-moved for summary judgment,[12] no fact-finding is required in order to resolve Count 2 (whether the Plan's suspension of his pension payments violated ERISA) – that issue can be determined solely from the evidence before the Board when it adjudicated Eisenrich's appeal. E.g., Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997) (Kyle, J., sitting by designation) (review for abuse of discretion typically limited to evidence before plan administrator). It is appropriate for the Court to enter summary judgment in Eisenrich's favor *sua sponte* under these circumstances, because the Board has thoroughly briefed the issue of whether its decision constituted an abuse of discretion. See, e.g., Madewell v. Downs, 68 F.3d 1030, 1048 (8th Cir. 1995) (district court may enter summary judgment *sua sponte* where party had adequate opportunity to address issues and was on notice that right to judgment as a matter of law was at issue).

Lastly, as a result of the foregoing, Eisenrich's alternative equitable-estoppel claim is moot, and it will be dismissed.

---

[12] At oral argument, Eisenrich requested that the Court grant summary judgment *sua sponte* on Count 2.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. No. 28) is **DENIED**;

2. Summary Judgment is **GRANTED** to Eisenrich *sua sponte* on Count 2 of the Complaint;

3. Count 3 of the Complaint is **DISMISSED WITH PREJUDICE** as moot; and

4. Eisenrich shall submit a memorandum on or before April 15, 2008, addressing the amount of the judgment to be entered in this case and any request for attorneys' fees (including the amount of such fees). The Plan may file a memorandum in response on or before April 22, 2008, *limited to the issues raised in Eisenrich's memorandum*; the Plan shall not reargue the propriety of summary judgment for Eisenrich. No further submissions (whether by memorandum, letter, affidavit, or otherwise) will be permitted absent further Order of the Court.

Dated: April 3, 2008                                                s/Richard H. Kyle
                                                                                                     RICHARD H. KYLE
                                                                                                     United States District Judge